**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

BCRS1 LLC,                                    Civil Action No. 20 Civ. 04246

           Plaintiff,

      v.                                    **ORAL ARGUMENT REQUESTED**

JACOB UNGER,

           Defendant.

------------------------------------------------------------x


**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION**
**FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**


**KING & SPALDING LLP**
David H. Kupfer, Esq.
1185 Avenue of the Americas
Tel: (212) 556-2100
Email: dkupfer@kslaw.com

*Attorney for Defendant Jacob Unger*

# Table of Contents

I.      PRELIMINARY STATEMENT ....................................................... 1

II.     RELEVANT BACKGROUND AND PROCEDURAL HISTORY ................................. 2

III.    ARGUMENT ...................................................................... 6

   A.   PLAINTIFF FAILS TO SATSFY THE STANDARD FOR LEAVE TO AMEND
        UNDER FED. R. CIV. P. 15(a) AND 16(b) ...................................... 6

        1.   Rule 15(a) Standard .................................................. 6

        2.   Rule 16(b) Standard .................................................. 6

        3.   Plaintiff has Failed to Establish Good Cause to File the SAC ......... 8

        4.   Leave to Amend Should Be Denied Because Plaintiff Was or Should
             Have Been Aware of the Additional Facts in the SAC When it Filed the
             Original Complaint and the First Amended Complaint .................. 8

        5.   Leave to Amend Should be Denied on Grounds of Undue Prejudice ..... 10

   B.   Leave to Amend is Futile Because the SAC's Claims  Have no Colorable Merit
        and Would Not Withstand  a Motion to Dismiss ............................. 12

        1.   Plaintiff's Amended and Enlarged CFAA Claims Could Not Survive a
             Motion to Dismiss .................................................. 12

        2.   All of Plaintiff's Claims, Including the Existing CFAA Claims Are
             Barred as a Matter of Law Under Federal Copyright Law .............. 18

        3.   The SAC Fails to State a Claim for Tortious Interference ........... 19

             a.   Tortious Interference with Contracts .......................... 19

             b.   Tortious Interference with Prospective Economic Advantage .... 20

        4.   The SAC Fails to State a Claim for *Prima Facie* Tort ............. 22

        5.   The SAC Fails to State a Claim for Negligence ..................... 24

        6.   The SAC Fails to State a Claim for Conversion and Aiding and
             Abetting Conversion ............................................... 24

IV.     CONCLUSION .................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.J. Trucco, Inc. v. Redcell Corp.*,
   2023 WL 5803578 (S.D.N.Y. Sept. 7, 2023) ...................................................... 15, 16, 17

*Advanced Aerofoil Technologies v. Todaro*,
   2013 WL 410873 (S.D.N.Y. Jan. 30, 2013) .............................................................. 16, 17

*Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*,
   760 F.2d 442 (2d Cir. 1985) ............................................................................................ 12

*Balakrishnan v. Kusel*,
   2009 WL 1291755 (E.D.N.Y. May 8, 2009) ........................................................... 20, 21

*Barrows v. Forest Labs., Inc.*,
   742 F.2d 54 (2d Cir. 1984) ........................................................................................ 10, 11

*BCRS1, LLC v. Unger*,
   2021 WL 3667094 (E.D.N.Y. Aug. 18, 2021) ............................................................... 25

*Berliner v. Port Authority of N.Y.*,
   2008 WL 11434516 (E.D.N.Y. Nov. 17, 2008) .............................................................. 24

*Berman v. Parco*,
   986 F. Supp. 195 (S.D.N.Y. 1997) .......................................................................... 8, 10

*Burns Jackson v. Lindner*,
   59 N.Y.2d 314 (N.Y. 1983) ...................................................................................... 22, 23

*Carvel Corp. v Noonan*,
   3 N.Y.3d 182 (2004) ....................................................................................................... 22

*Dais v. Lane Bryant, Inc.*,
   2000 WL 145755 (S.D.N.Y. Feb. 8, 2000) .................................................................... 10

*Deutsch v. Human Resource Mgmt.*,
   2020 WL 1877671 (S.D.N.Y. Apr. 15, 2020) ......................................................... 12, 13

*Est. of Kauffmann v. Rochester Inst. of Tech.*,
   932 F.3d 74 (2d Cir. 2019) ............................................................................................. 18

*Gallas v. Chopard USA Ltd.*,
   2020 WL 4547124 (Sup. Ct. N.Y. Cnty. Aug. 3, 2020) ................................................. 22

*Grace v. Rosenstock*,
   228 F.3d 40 (2d Cir. 2000) ............................................................................................... 6

*Grochowski v. Pheonix Constr.*,
318 F.3d 80 (2d Cir. 2003) ................................................................................ 12

*Gross v. Pennymac Loan Servs, LLC*,
2021 WL 2634764 (E.D.N.Y. June 25, 2021) .................................................... 10

*hiQ Labs, Inc. v. LinkedIn*
31 F.4th 1180, 1198 (9th Cir. 2022) ................................................................. 13

*Ivy Mar Co. v. C.R. Seasons, Ltd.*,
1998 WL 704112 (E.D.N.Y. Oct. 7, 1998) ............................................. 20, 21, 22

*IXL Inc. v. AdOutlet.Com, Inc.*,
2001 WL 315219 (N.D. Ill. Mar. 29, 2001) ...................................................... 18

*Kiarie v. Dumbstruck, Inc.*,
473 F. Supp.3d 350 (S.D.N.Y. 2020) .................................................................. 8

*La Barbera v. Ferran Enterprises, Inc.*,
2009 WL 367611 (E.D.N.Y. Feb. 10, 2009) ..................................................... 25

*Lingmain Yang v. Everyday Beauty Amore Inc.*,
2018 WL 4783968 (E.D.N.Y. Oct. 3, 2018) .................................................... 6, 7

*Lombard v. Booz-Allen & Hamilton, Inc.*,
280 F.3d 209 (2d Cir. 2002) .............................................................................. 24

*LSG 105 West 28th LLC v. Sinclair*,
2020 WL 3000536 (Sup. Ct. N.Y. Cnty. June 04, 2020) .................................. 23

*LVRC Holdings LLC v. Brekka*,
581 F.3d 1127 (9th Cir. 2009) .......................................................................... 17

*McCarthy v. Dun & Bradstreet Corp.*,
482 F.3d 184 (2d Cir. 2007) ................................................................................ 6

*McCurthy v. Sturm, Ruger and Co.*,
916 F. Supp. 366 (S.D.N.Y. 1996) .................................................................... 24

*McFadden v. Grand Union*,
1994 WL 62351 (S.D.N.Y. Feb. 18, 1994) ....................................................... 25

*Millar v. Ojima*,
354 F. Supp. 2d 220 (E.D.N.Y. 2005) ............................................................... 20

*MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*,
66 F.4th 77 (2d Cir. 2023) ................................................................................... 6

*Murphy v. Snyder*,
2013 WL 934603 (E.D.N.Y. March 8, 2013) .............................................. 7, 8, 25

*Posner v. Lewis*,
    18 N.Y.3d 566 (2012) .................................................................................................... 22

*Rice v. Schaefer*,
    2018 WL 4688949 (E.D.N.Y. Sept. 27, 2018) ............................................................. 12

*Sisyphus Touring v. TMZ Prods.*,
    208 F. Supp. 3d 1105 (C.D. Cal. 2016) ....................................................................... 19

*Smith v. Mikki More, LLC*,
    59 F. Supp. 3d 595 (S.D.N.Y. 2014) ............................................................................ 19

*Stanacard, LLC v. Rubard, LLC*,
    2016 WL 462508 (S.D.N.Y. Feb. 3, 2016) .................................................................. 18

*In re Terrorist Attacks on September 11, 2001*,
    714 F.3d 118 (2d Cir. 2013) ......................................................................................... 24

*Van Buren v. United States*,
    141 S. Ct. 1648 (2021) ............................................................................................ 13, 17

*Waite v. UMG Recordings*,
    450 F. Supp. 3d 430 (S.D.N.Y. 2020) .......................................................................... 18

*In re Wireless Tel. Servs. Antitrust Litig.*,
    2004 WL 2244502 (S.D.N.Y. Oct. 6, 2004) .................................................................. 8

*Zap Cellular, Inc. v. Weintraub*,
    2022 WL 4325746 (E.D.N.Y. Sept. 19, 2022) ................................................... 13, 16, 17

*Zenova Corp. v. Mobile Methodology*,
    997 F. Supp. 2d 207 (E.D.N.Y. 2014) .......................................................................... 18

**Statutes & Other Authorities**

17 U.S.C. § 101 ...................................................................................................................... 18

17 U.S.C. § 201 ...................................................................................................................... 18

18 U.S.C. § 1030 .............................................................................................................. *passim*

Fed. R. Civ. P. 12 ............................................................................................................... 2, 19

Fed. R. Civ. P. 15 ................................................................................................... 1, 6, 8, 10

Fed. R. Civ. P 16 ...................................................................................................... 6, 7, 8

Defendant Jacob Unger submits the following opposition to Plaintiff BCRS1 LLC's motion for leave to file a second amended complaint.

## I.    **PRELIMINARY STATEMENT**

Plaintiff previously moved for leave to file a proposed second amended complaint ("SAC") on April 1, 2022, more than two months after the close of fact discovery in this case. (ECF 55.) The Court denied that motion in January 2024 with leave to refile should settlement discussions fail. Plaintiff now moves again—on identical papers—for leave to file the proposed SAC (the "Renewed Motion"). As explained below, the Court should deny Plaintiff's Renewed Motion.

First, because the Court has entered multiple scheduling orders in this case and fact discovery has closed, Plaintiff's request for leave to amend is governed by Fed. R. Civ. P's 16(b)'s stricter "good cause" standard, as opposed to the more lenient standard set forth in Fed. R. Civ. P. 15(a). Yet, Plaintiff has not even bothered to assert, much less demonstrate, good cause for its dilatory request for leave to amend. Plaintiff has failed to explain and demonstrate good cause for its delay in moving for leave to amend until after the close of fact discovery. Further, Plaintiff knew or should have known the facts purportedly giving rise to the new claims when it commenced this action and, at the very latest, before November 17, 2021, when Plaintiff produced the so-called "server logs" (referred to herein as the "Activity Logs") that Plaintiff claims alerted it to the proposed new claims. Moreover, Defendant would be unduly prejudiced by the filing of the SAC, as it would necessitate substantial additional discovery including, *inter alia*, discovery of and relating to Plaintiff's existing and prospective customers and licensees (hereinafter referred to as "business relations discovery"), which Plaintiff refused to provide to Defendant during the course of fact discovery despite repeated demands.

Second, even under the more lenient Rule 15(a) standard, leave to amend should be denied as futile because the new claims and allegations of the SAC are subject to dismissal pursuant to

Fed. R. Civ. P. 12(b), for failure to state a claim.

For the foregoing reasons, as fully detailed below, Plaintiff's motion should be denied.

## II.    **RELEVANT BACKGROUND AND PROCEDURAL HISTORY**

In 2018, Defendant Jacob Unger co-founded a startup called Novera Capital Inc. and served as its CEO.  In 2020, David Eisenberger, the principal of Plaintiff and non-party entities bearing the "BCRS" name, told Unger that he wanted to invest in Novera.

In advance of such an investment, non-party BCRS2 LLC and Novera entered into a verbal consulting agreement in or around March 2020 in which Novera consulted regarding compatibility issues between two existing technology providers used by BCRS2.  In June 2020, non-party BCRS Ventures made an investment in Novera, pursuant to which it invested $200,000 and became Novera's largest shareholder and Eisenberger became an officer and board member.  In or around that time, Unger and Eisenberger also began negotiating a joint venture between Novera and BCRS2 in which they would develop software for their mutual benefit.

Because the parties were optimistic a joint venture agreement would be executed, in or around June 2020, Novera proceeded to work with BCRS2 to research and develop a platform for said joint venture.  In June 2020, Eisenberger and Unger agreed that, to save costs and to better facilitate a shared platform, Novera would move its technology infrastructure to a server owned by Plaintiff, thus establishing a **shared development environment** on Plaintiff's Server.  Several Novera employees were issued credentials to the Gitlab program housed on Plaintiff's Server (a program for writing and storing code, and which maintains version control).

From at least July through August 2020, BCRS2 and Eisenberger breached obligations they had to pay Novera's fixed costs relating to employees and refused to move forward with the joint venture.[1]  Eisenberger admitted to Unger that all the money from his businesses was gone,

---

[1] In addition, due to BCRS2 and Eisenberg's refusal to pay their obligations, Novera became insolvent.  The insolvency

including client funds.  Thereafter, in late August 2020, Novera took steps to separate itself from the BCRS entities and move in a different business direction.  This included assessing Novera's code and ensuring it would be functional when Novera moved back to a separate development environment off Plaintiff's server.  When Novera took these steps, following Eisenberger's shocking admissions, Eisenberger saw an opportunity to create leverage for himself.  He filed this action under the CFAA, alleging that Unger directed and conspired with Novera employee Karl Camota to disable computer code and render Plaintiff's purported website inoperable.

As Defendant will demonstrate on summary judgment (and trial, if necessary), Plaintiff's contentions are meritless for numerous reasons, including that: (i) no website was rendered inoperable as a result of any actions by Unger; (ii) access to Plaintiff's server was authorized and through login credentials issued by Plaintiff to Novera employees and was never revoked; (iii) the code that was purportedly affected belonged to Novera—not Plaintiff; (iv) any code that may have been impacted was staged in a development test site (called a "sandbox") and was not part of a live website; (v) technologically, Camota could not possibly have affected any code beyond the portion of the Gitlab program to which he was provided access, nor could he delete any backups or server logs; and (vi) Plaintiff had the ability to roll back any changes made by Camota through Gitlab's version control features <u>and</u> through backups of the data.  The server logs, Gitlab logs, and other technological evidence (if not destroyed by Plaintiff), would conclusively disprove Plaintiff's allegations and claims.

* * *

Plaintiff commenced the above-captioned action by the filing of a complaint (the "Original Complaint") on September 11, 2020.  (ECF 1.)  The Original Complaint asserted causes of action

---

triggered a clause in the BCRS Ventures investment agreement which gave Novera's legacy preferred shareholders an option to purchase Novera's assets for a nominal sum.

against Unger and Camota for (i) violations of the Computer Fraud and Abuse Act (the "CFAA") and (ii) conversion. The Court dismissed the Original Complaint on October 28, 2020 and directed Plaintiff to file an amended complaint. (*See* Minute Entry and Order, dated Oct. 29, 2020.)

On November 23, 2020, Plaintiff filed a first amended complaint (the "FAC") naming Unger as the sole Defendant and reasserting claims under the CFAA and for conversion. (ECF 17.) Defendant moved to dismiss the FAC in its entirety and, pursuant to a Memorandum Decision and Order dated August 17, 2021, the Court sustained the CFAA claims against Defendant, but dismissed the conversion claim. (ECF 24.)

On August 29, 2021, the parties submitted a joint Civil Case Management Plan (the "CMP") proposing, inter alia, that (i) "all non-expert discovery is to be completed by February 28, 2022, which date shall not be adjourned except upon a showing of good cause and further order of the Court"; and (ii) "Amended Pleadings may be filed without leave of the Court until October 21, 2021." (ECF 27.) Pursuant to a status conference held on September 1, 2021, the Court issued a minute entry and order establishing a discovery schedule and providing that discovery would close on December 31, 2021. (*See* Minute Entry and Order, dated Sept. 1, 2021.)

On October 14, 2021, Defendant served Plaintiff with written discovery requests, including a request for the production of documents. (Kupfer Decl. ¶ 5; Exhibits B, C.) Defendant's Document Request included, among other things, requests for the production of (i) server logs and other documents pertaining to the so-called "Plaintiff's Protected Server" or "PPS" that Plaintiff alleges underlies its CFAA claims. (Kupfer Decl. ¶ 6.) Plaintiff made its initial production of responsive documents on November 17, 2021 and made supplemental productions of responsive documents on November 18, 2021, December 22, 2021 and December 28, 2021. (*Id*. ¶ 7.)

Throughout the course of fact discovery, Plaintiff categorically refused to and did not produce any documents relating to its customers and licensees. (*Id*. ¶ 8.) Additionally, other than

certain screenshots of GitLab activity logs purportedly reflecting Camota's Gitlab activity on the PPS from August 25, 2020 through September 2, 2020 (the "Activity Logs"), Plaintiff failed to produce any actual server logs or other activity history for the PPS and the various services hosted on it. (*Id*. ¶¶ 9-11; Exhibits D, E.)

On December 31, 2021, the Court granted a joint application to extend discovery and issued an order (the "Amended Scheduling Order") providing: "The schedule proposed by the parties is approved. Specifically, **fact discovery will end 2/15/22** and expert discovery will end 4/15/22…. **This schedule is unlikely to be extended further**." (ECF 47 (emphasis added).)

On March 3, 2022, Defendant filed a pre-motion letter requesting a conference regarding its anticipated motion for summary judgment. (ECF 49.) Following a pre-motion conference held on March 18, 2022, the Court ordered that Plaintiff may file its motion for leave to amend its complaint by April 1, 2022. (*See* Minute Entry and Order, dated Mar. 18, 2022.) Plaintiff filed a motion for leave to file the SAC on April 1, 2022. (ECF 55.)

Neither party filed an affirmative expert report by the deadline. Following letters and conferences regarding discovery, on June 14, 2022, the Court appointed a special master as the sole expert "to identify and disclose relevant digital evidence in this case, due to the evidence's sensitivity and the complexity of its extraction from the parties' computer systems." (ECF 66.)

On January 29, 2024, at the request of the parties, the Court set a settlement conference to be held before the Magistrate Judge. (*See* Docket Order, dated Jan. 29, 2024.) On January 30, 2024, the Court denied Plaintiff's motion for leave to file a second amended complaint with leave to renew should settlement discussions fail. (*See* Docket Order, dated Jan. 30, 2024.)

On September 4, 2024, the parties informed the Court that their efforts to resolve the case had failed. (ECF 95.) On September 16, 2024, the Parties updated the Court regarding their respective positions on remaining discovery. (ECF 96.) The parties agreed that the special master

had not yet completed his assignment. Defendant asked that "following submission of the expert's report, discovery should remain open for a period of sixty (60) days to allow for any remaining discovery, including discovery prompted by the contents of the report." (*Id.*) Plaintiff maintained that all discovery is closed. (*Id.*) In a docket order dated September 19, 2024, the Court "decline[d] to rule on whether discovery shall remain open after the submission of the Expert Report, and will decide that issue following the submission of the Expert Report."

Plaintiff filed the Renewed Motion on November 27, 2024, nearly three months after settlement discussions failed and litigation resumed. (ECF 100.)[2]

## III.  ARGUMENT

### A.  PLAINTIFF FAILS TO SATSFY THE STANDARD FOR LEAVE TO AMEND UNDER FED. R. CIV. P. 15(A) AND 16(B)

#### 1.  Rule 15(a) Standard

Rule 15(a) provides that in cases where a party cannot amend as a matter of course, "a party may amend his pleading only with the opposing party's written consent or the court's leave." *See* Fed. R. Civ. P 15(a)(2); *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023). Such leave is in a court's discretion and a court "should freely give leave when justice so requires." *See* Fed. R. Civ. P. 15(a); *Grace v. Rosenstock*, 228 F.3d 40, 53 (2d Cir. 2000). However, "[a] district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

#### 2.  Rule 16(b) Standard

"[W]hen a scheduling order has already been entered in a case, Rule 15(a)(2)'s 'lenient standard' to amend the pleadings 'must be balanced against the requirement under Rule 16(b) that

---

[2] Plaintiff's proposed SAC (ECF 100-2) is annexed to the Declaration of David H. Kupfer, dated Dec. 30, 2024, filed together herewith ("Kupfer Decl."), as Exhibit A. References herein to Exhibits are exhibits to the Kupfer Decl.

the Court's scheduling order shall not be modified except upon a showing of good cause.'"

*Lingmain Yang v. Everyday Beauty Amore Inc.*, 2018 WL 4783968, *5 (E.D.N.Y. Oct. 3, 2018)

(quoting *Grochowski v. Pheonix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (internal quotations

omitted) and citing Fed. R. Cv. P. 16(b)(4) ("A schedule may be modified only for good cause and

with the judge's consent.")).  "A finding of good cause 'depends on the diligence of the moving

party.'"  *Id.*  (quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000)).

> Good cause may be established if the moving party can demonstrate the deadlines
> cannot reasonably be met despite the diligence of the party needing the extension.
> It may also be established by demonstrating that reasonably unforeseeable events
> occurring after the entry of the scheduling order precluded compliance with the
> deadlines in the [scheduling order].  Although the existence or degree of prejudice
> to the party opposing the modification might supply additional reasons to deny a
> motion, the focus of the inquiry is upon the moving party's reasons for seeking
> modification.  If that party was not diligent, the inquiry should end.

*Id.*  (quoting *LaFlamme v. Carpenters Local #370 Pension Plan*, 220 F.R.D. 181, 186 (N.D.N.Y.

2003) (alteration in original)); *see also Murphy v. Snyder*, 2013 WL 934603, *20 (E.D.N.Y. March

8, 2013) ("A finding of good cause requires that 'the moving party must, at a minimum, make a

showing of diligence.' … Under Rule 16(b), however, the mere absence of prejudice, bad faith,

futility, or similar factors is not sufficient to constitute 'good cause.'") (citations omitted).

The more stringent Rule 16(b) standard applies here, because multiple scheduling orders

were entered by the Court.  As detailed above, on October 29, 2020, the Court directed Plaintiff to

file the First Amended Complaint by September 11, 2020.  The Court subsequently granted

Plaintiff's request to extend that deadline to November 23, 2020.  Then, on September 1, 2021,

the Court set interim discovery dates and directed the completion of depositions and fact discovery

by December 31, 2021.  Finally, on December 31, 2021, the Court entered an amended scheduling

order, *inter alia*, extending the fact discovery deadline to February 15, 2022.  The Court's

scheduling orders did not allow for further amendments beyond the First Amended Complaint.

Moreover, pursuant to the jointly proposed Civil Case Management Plan submitted by the parties on August 29, 2021, Plaintiff agreed that the deadline to file amended pleadings without leave of the Court was October 21, 2021.

### 3.    Plaintiff has Failed to Establish Good Cause to File the SAC

Plaintiff does not address the applicable standard under Rule 16(b) and has failed to demonstrate good cause to modify the existing scheduling order to allow for the SAC.  *See In re Wireless Tel. Servs. Antitrust Litig.*, 2004 WL 2244502, at *5 (S.D.N.Y. Oct. 6, 2004) ("Rule 16 requires a different analysis than that undertaken in connection with Rule 15 and its 'standards may not be short circuited by an appeal to those of Rule 15.") (quoting *Parker*, 204 F.3d at 340)).

Specifically, Plaintiff has failed to explain why it waited until months after the close of fact discovery—before initially moving for leave to file the SAC.  Nor does Plaintiff explain why it waited nearly three months after the failure of settlement discussions to file its Renewed Motion. In such circumstances, irrespective of any other considerations, leave to amend is inappropriate. *See, e.g., Murphy*, 2013 WL 934603, at *21 ("This Court finds that the Defendants have not established good cause to permit an amendment at this date.  Since the defendants have not demonstrated good cause, the Court need not reach the issue of prejudice.") (citing *Carpenter v. Churchville Greene Homeowner's Assn.*, 2011 WL 4711961, at *6 (W.D.N.Y. Sept. 29, 2011) (Report and Recommendation adopted by 2011 WL 6012539 (W.D.N.Y. Dec. 1, 2011)).

### 4.    Leave to Amend Should Be Denied Because Plaintiff Was or Should Have Been Aware of the Additional Facts in the SAC When it Filed the Original Complaint and the First Amended Complaint

Likewise, leave to amend should be denied, under both Rule 15 and Rule 16 standards, because Plaintiff was aware at the outset of the case of all the additional facts in the SAC upon which Plaintiff's newly proposed claims are based.

A motion to amend may be denied "when the movant *knew or should have known* of the

facts upon which the amendment is based when the original pleading was filed ….” *Berman v. Parco*, 986 F. Supp. 195, 217 (S.D.N.Y. 1997)(emphasis added) (citation omitted); *Kiarie v. Dumbstruck, Inc.*, 473 F. Supp.3d 350, 357 (S.D.N.Y. 2020) (“[A] court may deny a motion to amend when the movant knew or should have known of the facts upon which the amendment is based when the original pleading was filed, particularly when the movant offers no excuse for the delay” (internal quotation marks and citation omitted)).

Indeed, during a March 18, 2022 pre-motion hearing, Plaintiff’s counsel represented that:

> [D]iscovery is [sic] essentially given up [] the detail that we needed to have that [conversion] claim go forward …. Likewise the tortious interference claim.  Again, the evidence gave us enough detail to establish that an occurrence did occur, and we have the right to assert it.
>
> And, lastly, you know, based on just the way they load their pre-motion letter, we believe that, if nothing else, it’s malicious and it would be prima facie tort.

Exhibit F (3-18-22 Hearing Tr.) at 3:5 – 3:14.

The Court then pointedly asked Plaintiff’s counsel, “When did this additional discovery bring these claims to your attention?” and Plaintiff’s counsel responded as follows:

> So some of it actually came from the pre-motion letter.  In other words, for example, the prima facie tort is something that, basically, was based off their letter essentially asserting – they have the ability to fix the problem, like, within five minutes, but didn’t, so that – that, in itself, I think, is maliciousness.  That’s something that would be prima facie tort.  And then some of the other stuff, for example, the detail, we went into the server, we found whatever logs we were able to find after they deleted whatever they deleted….
>
> So we essentially obtained – we went through our stuff and we pulled out the server logs; and based on the server logs, we think that provides enough information for the Court to establish the conversion claim ….

*Id.* at 3:25 – 4:18.

Thus, in response to the Court’s direct question, Plaintiff admitted that the only “discovery” which brought the newly proposed claims to Plaintiff’s attention was the Activity Logs that Plaintiff produced <u>from its own files</u> on November 17, 2021.  Plaintiff does not explain why it

could not have discovered the logs—which were uniquely within its possession—prior to commencing this action or prior to filing the First Amended Complaint.  Giving Plaintiff the benefit of every conceivable doubt, the facts upon which Plaintiff's proposed new claims are based were known to Plaintiff by no later than November 17, 2021, when it produced the Logs.  Yet, Plaintiff offers no excuse for delaying for more than four months from that date and more than two months after the close of fact discovery to file its initial motion for leave.

Plaintiff's lack of diligence is also apparent with respect to the balance of the new claims included in the SAC, as Plaintiff fails to explain why it could not have included the claims in the Original Complaint or the FAC and Plaintiff fails to identify any new information that would make the claims any more viable at this time.

For example, Plaintiff's proposed tortious interference and negligence claim are not based on any new facts obtained through discovery.  Even under the more lenient Rule 15 standard, "[t]his dooms the proposed amendment."  *See Gross v. Pennymac Loan Servs, LLC*, 2021 WL 2634764, *2 (E.D.N.Y. June 25, 2021) (noting that "various courts have held that leave to amend may be denied 'when the movant knew or should have known of the facts upon which the amendment is based when the original pleading was filed, particularly when the movant offers no excuse for the delay.") (citations omitted)).

In such circumstances, "denial of leave to amend is appropriate."  *See Dais v. Lane Bryant, Inc.*, 2000 WL 145755, *2 (S.D.N.Y. Feb. 8, 2000) (denying leave to amend where plaintiff waited until "just prior to the close of discovery"); *Barrows v. Forest Labs., Inc.*, 742 F.2d 54, 59 n.11 (2d Cir. 1984) (denying leave to amend where plaintiffs failed to "explain why the new theories could not have been presented in the original complaint as alternatives").

## 5.    Leave to Amend Should be Denied on Grounds of Undue Prejudice

"'Prejudice to the opposing party if the motion is granted has been described as the most

important reason for denying a motion to amend.  Prejudice may be found, for example, when the amendment is sought after discovery has been closed.'" *Berman*, 986 F. Supp. at 217 (quoting 1 M. Silverberg, *Civil Practice in the Southern District of New York* § 6.26 (internal citations omitted)); *see also Barrows v. Forest Labs., Inc.*, 742 F.2d 54, 58 (2d Cir. 1984) (prejudice to opposing party is "touchstone" of district court's authority to deny leave to amend).

Here, Plaintiff first requested leave to amend came after the close of fact discovery. Plaintiff contends nonetheless that "the SAC does not require any discovery beyond the discovery required by the original complaint[]" and that "Plaintiff is not requesting any additional discovery beyond those previously demanded to support the original complaint." (*See* Plaintiff's Memo. of Law (ECF 100-3) ("Memo.") at 3.)  However, notwithstanding Plaintiff's contentions, additional discovery would clearly be necessary if Plaintiff is granted leave to amend, including, *inter alia*, discovery regarding Plaintiff's new contentions that (i) "Plaintiff was previously unable to identify the technology stolen because Camota deleted the history on the Plaintiff's Protected Server"; and (ii) "[A]lthough plaintiff has been unable to recover the stolen files, plaintiff was able to recover Camota's Plaintiff's Protected Server activity logs …." (ECF 50 at 10.)

Additionally, business relations discovery would also be necessary in light of Plaintiff's proposed tortious interference claims, which are predicated on allegations that Defendant interfered with Plaintiff's relationships with existing and prospective customers and licensees.

Indeed, despite Defendant's repeated demands during fact discovery, Plaintiff has categorically refused to produce any documents or information regarding its customers and licensees.  Not only has Plaintiff refused to provide such discovery, but it has also actively thwarted Defendant's efforts to obtain such discovery from third parties by intimidating the one customer of Plaintiff who Defendant was able to identify through his own efforts. (*See* ECF 54 at 5.)

Such business relations discovery is directly relevant to Plaintiff's proposed tortious

interference claims and will require additional discovery, including documents and depositions, from Plaintiff and the third-party customers and licensees.

Under the circumstances, Defendant would be unduly prejudiced if Plaintiff is allowed to amend its claims at this late stage and require Defendant to incur the significant time and expense of additional discovery that Plaintiff previously withheld and actively interfered with.  *See, e.g.*, *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985) (affirming denial of leave to amend on grounds that "the proposed amendment would have been especially prejudicial given the fact that discovery had already been completed and [defendant] had already filed a motion for summary judgment"); *Grochowski v. Phoenix Construction*, 318 F.3d 80, 86 (2d Cir. 2003) (upholding denial of leave to amend sought after discovery had closed and while summary judgment motion was pending).

## B.    LEAVE TO AMEND IS FUTILE BECAUSE THE SAC'S CLAIMS HAVE NO COLORABLE MERIT AND WOULD NOT WITHSTAND A MOTION TO DISMISS

"Leave to amend is futile if the amended complaint would have no colorable merit and would not withstand a motion to dismiss."  *Rice v. Schaefer*, 2018 WL 4688949, *8 (E.D.N.Y. Sept. 27, 2018) (citing *Ho Myung Moolsan Co., Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 250 (S.D.N.Y. 2009) (other citation omitted)).  Plaintiff's Motion is futile because each of the claims in the SAC would be subject to dismissal on a motion to dismiss.

### 1.    Plaintiff's Amended and Enlarged CFAA Claims Could Not Survive a Motion to Dismiss

Plaintiff seeks to amend its CFAA claim and add allegations and claims under additional sections of the CFAA.  Plaintiff's claims would not withstand a motion to dismiss.

"The CFAA is principally a criminal statute that prohibits '[f]raud and related activity in connection with computers,' 18 U.S.C. § 1030, but it also provides a private right of action to

'[a]ny person who suffers damage or loss by reason of a violation of this section,' *id*. § 1030(g)."
*Deutsch v. Human Resource Mgmt*., 2020 WL 1877671, at *2 (S.D.N.Y. Apr. 15, 2020). "[T]he
scope of the civil actions permitted under ... Section 1030(g), however, has always been limited."
*Id*. (quoting *Hancock v. Cty. of Rensselaer*, 882 F.3d 58, 63 (2d Cir. 2018)).    To maintain its
action, "Plaintiff must allege that Defendants 'intentionally accesse[d] a protected computer
without authorization,'" or "exceeded authorized access" and as a result of such conduct, caused
damage and loss. *Id*. (quoting 18 U.S.C. § 1030(a)(5)(C)); *Zap Cellular, Inc. v. Weintraub*, 2022
WL 4325746, at *6 (E.D.N.Y. Sept. 19, 2022).

In *Van Buren v. United States*, 141 S. Ct. 1648, 1658 (2021), the United States Supreme
Court held that an individual exceeds authorized access "when he accesses a computer with
authorization but then obtains information located in particular areas of the computer—such as
files, folders, or databases—that are off limits to him." *Id*. at 1662.  But individuals do not exceed
authorized access when they "have improper motives for obtaining information that is otherwise
available to them." *Id*. at 1652.  As the Ninth Circuit explained in *hiQ Labs, Inc. v. LinkedIn*:

> *Van Buren* found the "interplay between the 'without authorization' and 'exceeds
> authorized access' clauses of subsection (a)(2) ... particularly probative." *Id*. at
> 1658.  "The 'without authorization' clause ... protects computers themselves by
> targeting so-called outside hackers—those who 'acces[s] a computer without any
> permission at all.'" *Id*. (quoting *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127,
> 1133 (9th Cir. 2009)).  The "'exceeds authorized access' clause ... provide[s]
> complementary protection for certain information within computers ... by targeting
> so-called inside hackers—those who access a computer with permission, but then
> '"exceed" the parameters of authorized access by entering an area of the computer
> to which [that] authorization does not extend.'" *Id*. (quoting *United States v. Valle*,
> 807 F.3d 508, 524 (2d Cir. 2015)).  "[L]iability under both clauses stems from a
> gates-up-or-down inquiry—one either can or cannot access a computer system, and
> one either can or cannot access certain areas within the system." *Id*. at 1658–59.

31 F.4th 1180, 1198 (9th Cir. 2022).

In connection with its CFAA claims, Plaintiff alleges in the proposed SAC as follows:

- "In or about February 2020, plaintiff entered into an agreement (the "Consulting

13

Agreement") with Novera … through its CEO Jacob Unger [which] provided that Novera would develop a computer program [for Plaintiff] which would include an electronic trading platform for … cryptocurrency traders (the "Web Site Platform")." (SAC ¶¶ 13-14.) "Unger represented to plaintiff that the cost of the Web Site Platform would be reimbursement for the wages of the software developers employed by Novera of approximately $25,000 per month" and "that the Web Site Platform would be completed within three months by June 2020." (*Id*. ¶¶ 22-23.) There is no dispute between the parties that the Consulting Agreement was an <u>oral agreement</u>. (*Id*.; *see also id*. ¶ 73.) The SAC does not allege that there was an agreed-upon term by which the Consulting Agreement would end.

- "The Web Site Platform was to be developed and stored on plaintiff's protected computer server ("Plaintiff's Protected Server")." (SAC ¶ 21.) "From March through June 8, 2020, plaintiff worked with Novera's employees, including software engineers Marek Laskowski and Karl Camota." (SAC ¶ 59.) Novera's employees "Laskowski and Camota worked on Plaintiff's Website Technology" on Plaintiff's server and had Plaintiff's express permission to access the server and work on the technology. (SAC ¶ 61; *see also* SAC ¶¶ 60, 62-64.)

- "Plaintiff remitted in excess of $85,000 to Novera" for its work under the consulting agreement (in addition to $120,000 to other developers). (SAC ¶¶ 26-27.) However, "Novera provided a beta version of the Web Site Platform. Novera failed to deliver the final Web Site Platform pursuant to the terms of the Agreement." (SAC ¶¶ 29-30.)

- "On or about June 8, 2020, BCRS Ventures LLC [an affiliate of Plaintiff] and Novera entered into the BCRS Ventures Investment," an investment by which "Eisenberger through BCRS Ventures LLC [invested] approximately $300,000 into Novera." (SAC ¶¶ 67-68.) Unger contends that "the consulting agreement ended on June 8, 2020, when BCRS Ventures LLC purchased an interest in Novera." (SAC ¶¶ 72, 113.)

- "Unger testified that on or prior to June 8, 2020, he directed all of Novera's employees to stop performing any computer work for plaintiff with 'the exception of a consulting for a transition plan . . . Novera was to assist in forming a new team'" to service Plaintiff's technology needs. (SAC ¶ 74.) "[A]ll consulting work for plaintiff ceased between June 8, 2020, and June 15, 2020." (SAC ¶ 76.)

- Unger attempted to extort Plaintiff for additional funding and rights to technology from June through August 2020. (SAC ¶¶ 76-82.) During this time period, "Unger refused to allow any Novera employees to complete the Web Site Platform and perform any consulting services for plaintiff." (SAC ¶ 83.)

- On August 25, 2020, "Unger directed Camota and others to access Plaintiff's Protected Server despite having directed Camota and others not to perform any consulting services on Plaintiff's Protected Server since June 8, 2020." (SAC ¶ 88.)

14

- "[O]n or about September 2, 2020, Unger [again] directed Marek Laskowski and Karl Camota to access Plaintiff's Protected Server." (SAC ¶ 94.)    [A]s a result of Camota's unlawfully accessing Plaintiff's Protected Server, Plaintiff's Web Site Platform became inoperable." (SAC ¶ 98.)

Even reading the SAC in the light most favorable to Plaintiff, the SAC fails to allege any facts that would plausibly suggest that the credentials that were issued to Novera's employees were revoked or that Plaintiff communicated to Novera or its employees that its permission to access the server was terminated.  As described above, the SAC alleges that (i) Plaintiff engaged Novera to develop technology on its server and gave Novera employees access to the server; (ii) Novera delivered a beta version of the technology to Plaintiff; (iii) Unger, as Novera's CEO, took the position the Consulting Agreement ended in June 2020 and directed Novera's employees to stop working on the technology around June 8, the same time Plaintiff's principal invested $300,000 into Novera through an affiliated entity; and (iv) on August 25 and September 2, 2020, the employees that had developed the technology on the server accessed the server and copied and deleted files, causing Plaintiff damages.  Plaintiff does not allege that it terminated the Consulting Agreement, that it revoked access to its server, or that it told Novera or its employees that they may not access the server.  Thus, Plaintiff fails to plausibly allege that Novera's employees accessed the server "without authorization" or that they "exceeded authorized access."  *See A.J. Trucco, Inc. v. Redcell Corp.*, 2023 WL 5803578, at *3-4 (S.D.N.Y. Sept. 7, 2023).

*A.J. Trucco* is on point and highly instructive.  In that case, Defendant Redcell provided "software development" and "IT support maintenance" to the plaintiff from 2008 to 2019, at which time the relationship "began to sour" and ended.  *Id*. at 1.  In September 2019, the plaintiff's president noticed activity on its server by Redcell personnel.  *Id*.  Plaintiff brought claims under the CFAA and Redcell moved to dismiss.  Plaintiff argued "that Redcell's access to Trucco's server following the end of the parties' relationship was unauthorized" and plaintiff "refer[ed] to caselaw

in … holding that post-termination access by an employee to an employer's system may be inferred to be unauthorized." *Id*. at *4. The court dismissed the CFAA claim, finding that the complaint had failed to adequately allege that the access by Redcell was without authorization:

> [W]ithout details about how the companies parted ways, the Court cannot conclude that the end of Trucco's relationship with Redcell was akin to an employee's termination. Specifically, Trucco does not explain whether it was self-evident that Redcell was no longer authorized to access Trucco's server and whether Trucco imposed any post-relationship obligations upon Redcell, such as deleting programs that it had previously installed on Trucco's server, providing Trucco with information about passwords, or refraining from accessing backup copies that Redcell had made.

2023 WL 5803578, at *4. Here, like in *A.J. Trucco*, the SAC fails to allege any facts by which the Court could conclude that it was either communicated or self-evident to Novera or its employees that the relationship had ended and that their access had been revoked. The lack of such allegations is coupled with the SAC's specific allegations that would lead to the opposite conclusion, including: (i) that it was Unger that contended that the Consulting Agreement had ended (implying that Plaintiff did not believe it had ended) (SAC ¶¶ 72, 113), (ii) that Unger had directed Novera's employees to stop work (but Plaintiff ostensibly did not prohibit work from continuing) (SAC ¶¶ 74, 76), (iii) that Plaintiff's principal had, at the same time, invested $300,000 into Novera (SAC ¶¶ 67-68), and (iv) that Novera continued to assist Plaintiff after that time (SAC ¶ 74).

This Court's analysis in *Zap Cellular, Inc. v. Weintraub*, 2022 WL 4325746 (E.D.N.Y. Sept. 19, 2022) is likewise instructive. In that case, the Court sustained CFAA claims against a terminated employee because "the Complaint clearly alleges that Plaintiff revoked A. Weintraub's authorization to access Plaintiff's computers and servers after he was terminated as CEO." *Id*. at *8. The Defendant in *Zap Cellular* tried to analogize that case to *Advanced Aerofoil Technologies v. Todaro*, 2013 WL 410873 (S.D.N.Y. Jan. 30, 2013). In *Advanced Aerofoil*, the Southern District dismissed CFAA claims against several former employees who allegedly continued to access

16

plaintiff's computer system to obtain its confidential information after they had resigned, noting that plaintiff had not revoked the former employees' authority to access its computer system at the time of their access of the system.  But the *Zap Cellular* court distinguished *Advanced Aerofoil* finding that "the complaint in *Advanced Aerofoil* alleged that the defendants had secretly resigned and thus the plaintiff 'did not know about the resignations and had not terminated [the defendants'] access to its systems.' Accordingly, in *Advanced Aerofoil*, the court could not reasonably infer from the complaint that the plaintiff had revoked the defendants' authorization to access the relevant information."  2022 WL 4325746, at *9.

Similarly, the Ninth Circuit's analysis in *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009), a case cited approvingly by the Supreme Court in *Van Buren*, is helpful.  In *Brekka*, the court held that notice of revocation of access is essential in finding liability under CFAA:  "If the employer has not rescinded the defendant's right to use the computer, the defendant would have no reason to know that making personal use of the company computer in breach of a state law fiduciary duty to an employer would constitute a criminal violation of the CFAA."  581 F.3d at 1135.  The Court thus held that "[t]here is no dispute that Brekka was given permission to use LVRC's computer and that he accessed documents or information to which he was entitled by virtue of his employment with LVRC. Because Brekka had authorization to use the LVRC computer, he did not access a computer 'without authorization.'"  *Id*.

Here, like *A.J. Trucco*, and consistent with *Zap Cellular*, *Advanced Aerofoil,* and *Brekka,* the SAC fails to allege facts by which the Court would reasonably infer that Novera's employees accessed the server "without authorization" or "exceeded authorized access," as interpreted in *Van Buren*.  Accordingly, the claim is futile, and the Court should deny Plaintiff's motion.

17

### 2. All of Plaintiff's Claims, Including the Existing CFAA Claims Are Barred as a Matter of Law Under Federal Copyright Law

The SAC's allegations doom as futile each proposed claim, including the CFAA claims, because Plaintiff's predicate claims of ownership of the relevant technology does not comport with applicable federal copyright law. As alleged in the SAC, (i) each claim is predicated on Plaintiff's ownership of the Web Site Platform and underlying code, (ii) the ownership derives from a purported "Consulting Agreement," and (iii) the Consulting Agreement was an oral contract. (SAC ¶¶ 13-20, 73, 108, 110.) On such facts, Novera owned the code at issue, not Plaintiff.

"Copyright in a work protected under this title vests initially in the author or authors of the work," 17 U.S.C. § 201(a), except in the case of a "work made for hire," in which case the "person for whom the work was prepared is considered the author," 17 U.S.C. § 201(b). The technology at issue in this action—the development of computer code and software—falls under the work for hire doctrine. *See Stanacard, LLC v. Rubard*, LLC, 2016 WL 462508, at *8 (S.D.N.Y. Feb. 3, 2016) ("[C]ourts have held that computer programs used together as a software system qualify as 'compilations' or 'collective works' within the meaning of § 101(2)."); *IXL Inc. v. AdOutlet.Com, Inc.*, 2001 WL 315219, at *9 (N.D. Ill. Mar. 29, 2001) ("the source code created by iXL falls within the definition of "work made for hire" under 17 U.S.C. § 101").

"Under Section 101 of the Copyright Act, a work made for hire is either a work 'prepared by an employee within the scope of his or her employment' or certain types of 'specially ordered or commissioned' work, <u>so long as the parties agree in writing that the work will be considered a work made for hire</u>. *Waite v. UMG Recordings*, 450 F. Supp. 3d 430, 434 (S.D.N.Y. 2020). **A written agreement providing for the transfer of ownership is a critical component without which the author (or its employer) remains the owner of the work**. *See Est. of Kauffmann v. Rochester Inst. of Tech.*, 932 F.3d 74, 77 (2d Cir. 2019) (concluding that creator of copyrighted

materials is the "author" in absence of contemporaneous written agreement establishing work-for-hire relationship); *Zenova Corp. v. Mobile Methodology*, 997 F. Supp. 2d 207, 210 (E.D.N.Y. 2014) ("ownership of a copyright vests in the person for whom an independent contractor creates the work, but only if there is the express, written, and signed agreement to that effect"); *Smith v. Mikki More, LLC,* 59 F. Supp. 3d 595, 609, 612 (S.D.N.Y. 2014) (same); *Sisyphus Touring v. TMZ Prods.*, 208 F. Supp. 3d 1105, 1111-12 (C.D. Cal. 2016) (purported oral agreement insufficient).

Given these undisputed facts, Plaintiff cannot prevail on any of its existing or proposed claims as they are all predicated on ownership of the software and computer code by way of a verbal agreement.  For example, as it pertains to the CFAA, Plaintiff would be unable to allege the economic loss required to sustain a CFAA claim if the damages it suffered was the loss of software it did not own.  Accordingly, the Court should deny Plaintiff's motion for leave to amend.

**3.    The SAC Fails to State a Claim for Tortious Interference**

Plaintiff's SAC includes as its Second Claim for Relief claims for tortious interference with contracts and tortious interference with prospective economic advantage.  In support of each of these claims, the SAC alleges that (i) "Plaintiff created the Plaintiff's Website Technology to license to its customer for their use to buy and sell cryptocurrency"; (ii) "Defendant was aware of plaintiff's business"; (iii) Defendant engaged in the unlawful access of Plaintiff's Protected Server in order to interfere with plaintiff's economic advantage"; (iv) "Defendant interfered with plaintiff's opportunities of creating a [sic] running the Web Site Platform and providing services of potential customers"; (v) "Defendant acted with the sole purpose of harming plaintiff"; and (vi) "Defendant's conduct was unlawful and/or used wrongful means."  (SAC ¶¶ 147-52.)

As demonstrated below, Plaintiff's proposed tortious interference claims are futile because they are inadequately pled and would be subject to dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

**a.    *Tortious Interference with Contracts***

"Under New York law, the elements of a claim for tortious interference with contractual relations are: (1) the existence of a valid contract between plaintiff and a third party; (2) defendants' knowledge of that contract; (3) defendants' intentional and improper procurement of a breach of that contract; and (4) resulting damage to the plaintiff from the breach." *Balakrishnan v. Kusel*, 2009 WL 1291755, *11 (E.D.N.Y. May 8, 2009) (citing *Trionic Assocs., Inc. v. Harris Corp.*, 27 F. Supp. 2d 175, 185 (E.D.N.Y. 1998) (internal citation omitted)).

"Moreover, in a tortious interference with contract action, 'it is axiomatic that there must be a breach of that contract by the other party' … and the plaintiff must 'identify a specific contractual term that was breached.'" *Id.* at *37 (quoting *Trionic,* 27 F. Supp. 2d at 185 and *Millar v. Ojima*, 354 F. Supp. 2d 220, 230 (E.D.N.Y. 2005).

Here, the SAC fails to allege the existence of a single contract between Plaintiff and any third-party customer and, necessarily, also fails to identify any specific contractual term that was breached by such unidentified third-party.  Moreover, in light of Plaintiff's failure even to identify any actual contract that was breached, it goes without saying that Plaintiff has not incurred any damages as a result of such unidentified third party's breach of its contract with Plaintiff.[3]

Finally, Plaintiff's allegations that Defendant knew of and intentionally and improperly procured the breach of some unspecified contract between Plaintiff and some unidentified third party are entirely conclusory and thus insufficient to satisfy any of the requisite elements of a claim for tortious interference with an existing contract.  *See, e.g., Ivy Mar Co. v. C.R. Seasons, Ltd.*, 1998 WL 704112, *14 (E.D.N.Y. Oct. 7, 1998).

### b.    *Tortious Interference with Prospective Economic Advantage*

---

[3] The SAC alleges damages based on Plaintiff's alleged payments to Defendant for the development of Plaintiff's Website Technology, as well as funds paid to other developers for the development and replacement of Plaintiff's Website technology.  (SAC ¶ 104.)  However, any such alleged damages could not have resulted from the purported breach by a third- party customer of its contract with Plaintiff.  Rather, such alleged damages would have resulted from Defendant's purported deletion of Plaintiff's so-called "Website Technology."

The SAC likewise fails to state a claim for tortious interference with prospective economic advantage. "A claim for tortious interference with prospective economic advantage requires a plaintiff to demonstrate: (1) the existence of a profitable business relationship between plaintiff and a third party; (2) that the defendant knew of the relationship and intentionally interfered with it; (3) that the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Balakrishnan*, 2009 WL 1291755, at *11 (citing *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006)).

Here, the SAC fails to allege the existence of a profitable relationship between Plaintiff and any third party. Rather, the SAC refers only to Defendant's alleged interference with Plaintiff's provision of services to "*potential* customers." (SAC ¶ 150 (emphasis added).) The SAC also does not allege that Defendant knew of Plaintiff's unspecified relationship with a third-party. Rather, the SAC merely alleges that Defendant was generally "aware of plaintiff's business." *Id*. ¶ 148. Moreover, "[u]nder New York law, 'an essential element of this tort is that the plaintiff would have consummated a contract with another person but for the interference of the defendant.'" *Balakrishnan*, 2009 WL 1291755, at *11 (quoting *Sch. of Visual Arts v. Kuprewicz*, 3 Misc. 3d 278, 288 (Sup. Ct. N.Y. Cnty. 2003) (internal citation omitted)). Here, the SAC fails to plead that Plaintiff would have consummated a contract with a third party "but for the interference with defendant."

Plaintiff argues that "'[i]t is not necessary for [plaintiffs] to prove that they would have been a party to any future contract with its customers … [r]ather, 'the tort encompasses …'interference with … the opportunity of selling or buying … chattels or services, and any other relations leading to potentially profitable contracts.'" (Memo. at 9 (quoting *Ivy Mar Co.*, 1998 WL 704112, at *16 and citing *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir. 1998)).

However, even under the seemingly more lenient standard articulated in *Ivy Mar Co.*, a

claim for tortious interference with prospective economic advantage must still be predicated on allegations "that the defendant tortiously interfered with 'a continuing business or other customary relationship not amounting to a formal contract.'"  *See Ivy Mar Co.*, 1998 WL 704112, at *15. Further, the New York Court of Appeals held in *Carvel Corp. v Noonan*, 3 N.Y.3d 182, 192 (2004), that the culpable conduct encompassed in this tort is "by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship."

Here, the SAC fails to allege the existence of any such "continuing business or other customary relationship" and, rather, merely refers in the most vague and conclusory terms to "plaintiff's opportunities of creating a [sic] running the Web Site Platform and providing services of potential customers." (SAC ¶ 150.)  Nor does it allege any conduct directed to third parties.

### 4.    The SAC Fails to State a Claim for *Prima Facie* Tort

"To state a legally cognizable claim for prima facie tort, a plaintiff must allege '(1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful."  *Posner v. Lewis*, 18 N.Y.3d 566, 570 n.1 (2012) (citation omitted).  "To satisfy the requirement that defendant's alleged actions were without justification or excuse, plaintiff must show that malevolence was the sole motivation for defendant's actions.  Simply alleging that defendant inflicted harm without justification does not demonstrate that defendant's sole motivation was malevolence."  *Gallas v. Chopard USA Ltd.*, 2020 WL 4547124, *2 (Sup. Ct. N.Y. Cnty. Aug. 3, 2020); *see also Burns Jackson v. Lindner*, 59 N.Y.2d 314, 333 (N.Y. 1983) ("there is no recovery in prima facie tort unless malevolence is the sole motive for defendant's otherwise lawful act").

Here, the SAC does not allege that Defendant acted with disinterested malevolence nor is there any basis for such allegations.  (*See* SAC ¶¶ 155-64.)  To the contrary, Plaintiff contends that "Unger damaged the PPS in order to facilitate his extortion."  (Memo. at 8; *see also* SAC ¶ 139.)

Thus, Plaintiff's own claims (which Defendant categorically denies) refute any potential allegation that Plaintiff acted out of "sole" or "disinterested malevolence." *Posner v. Lewis*, 18 N.Y.3d at 570 n.1; *Burns Jackson*, 59 N.Y.2d at 333; *LSG 105 West 28th LLC v. Sinclair*, 2020 WL 3000536, at *7 (Sup. Ct. N.Y. Cnty. June 04, 2020) ("Complaint fails to plead that disinterested malevolence was the sole motive for … wrongful actions because the Complaint asserts dual motives [including]: (i) malicious intent to prevent construction of the Hotel, and (ii) extortion of additional money from the Plaintiff's after the hotel became operational").

Moreover, Plaintiff's proposed claim for *prima facie* tort and, in particular, the allegations of malevolence, are predicated on defense counsel's assertion in a pre-motion letter (ECF 49 at 3) that "Defendant's [summary judgment] motion will also establish that Camota's actions could have easily been reversed within minutes, without any expense to Plaintiff." Specifically, Plaintiff's counsel stated in a March 18, 2022 hearing, in response to the Court's question of when discovery brought the additional claims to its attention:

> So some of it actually came from the pre-motion letter. In other words, for example, the prima facie tort is something that, basically, was based off their letter essentially asserting – they have the ability to fix the problem, like, within five minutes, but didn't, so that – that, in itself, I think, is maliciousness. That's something that would be prima facie tort.

Exhibit F (3-18-22 Hearing Tr.) at 3:25 – 4:18.

However, as recognized by this Court, there is simply no precedent for basing a claim of *prima facie* tort on the statements of counsel in a pre-motion conference letter to the Court.[4] Moreover, it is simply not the case that Defendant or its counsel ever claimed the ability to reverse Camota's actions. Rather, in his pre-motion letter, Defendant's counsel indicated that it was within

---

[4] In this regard, Defendant notes that, during the March 18, 2022 hearing, the Court asked if "there is a single case where someone predicated a prima facie tort claim based on a letter to a judge?" and, in answer to its own question, the Court stated "The answer has got to be no. It's a privileged communication. It cannot give rise to an action in and of itself. If it violates Rule 11 or if it violates 1827, you have sanctions available to you, but that's not a *prima facie* tort."

*Plaintiff's* ability to reverse Camota's actions. *See* Exhibit F (3-18-22 Hearing Tr.) at 7:21 – 8:6. Thus, Plaintiff's proposed *prima facie* tort claim is predicated on an intentional misreading and distortion of Defense counsel's statement to the Court.

### 5.    The SAC Fails to State a Claim for Negligence

"Under New York law, the elements of a negligence claim are: (i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002).

The existence of a duty is "elemental to any recovery in negligence," and failure to plead duty will result in dismissal of a negligence claim. *Berliner v. Port Authority of N.Y.*, 2008 WL 11434516, *5 (E.D.N.Y. Nov. 17, 2008) (quoting *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008)); *McCurthy v. Sturm, Ruger and Co.*, 916 F. Supp. 366, 368 (S.D.N.Y. 1996) ("In the absence of a duty, there is no breach and without a breach there is no liability.") (citations omitted). Here, the SAC contains no allegations of duty whatsoever or breach of that duty. (SAC ¶¶ 165-170.) Nor can the existence of any duty be inferred from anything alleged in the SAC. Thus, the negligence claim would be subject to dismissal on a motion to dismiss. *See In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 126 (2d Cir. 2013) (complaint must allege duty, breach, and proximate causation).

### 6.    The SAC Fails to State a Claim for Conversion and Aiding and Abetting Conversion

The SAC does not include a claim for conversion or aiding and abetting conversion. Yet, Plaintiff's memorandum of law argues that such claims are properly alleged in the SAC and maintains that Exhibit A to its motion "is a copy of the proposed Second Amended Complaint that is the subject of this motion." (ECF 100-1 at ¶ 3.)[5] Accordingly, Plaintiff's request for leave to

---

[5] This could not be the result of inadvertence as Plaintiff's initial motion likewise argued for a conversion claim but failed to include such a claim in the proposed pleading and Defendant argued that leave should be denied on that basis.

re-assert its previously dismissed conversion claims should be summarily denied because Plaintiff failed to include the proposed conversion claims in its SAC. *La Barbera v. Ferran Enterprises, Inc.*, 2009 WL 367611, at *3 (E.D.N.Y. Feb. 10, 2009) ("In order to meet the requirements of particularity in a motion to amend, 'a **complete copy** of the proposed amended complaint must accompany the motion so that both the Court and the opposing party can understand the exact changes sought.'" (quoting *Zito v. Leasecomm Corp.*, 2004 WL 2211650, at *25 (S.D.N.Y. Sept.30, 2004) (emphasis added)); *Murphy*, 2013 WL 934603, at *20 (same); *see also McFadden v. Grand Union*, 1994 WL 62351, at *1 (S.D.N.Y. Feb. 18, 1994) (finding "motion for leave to amend inadequate because it fails to attach the SAC");

Moreover, the Court has already dismissed the conversion claim from both the Original Complaint and the FAC, in the latter instance noting the impossibility of evaluating Plaintiff's conversion claim "given the lack of facts in the complaint." While Plaintiff points to the Activity Logs to show that certain files purportedly copied and deleted, Plaintiff offers no information regarding the nature or contents of these folders and files, nor is it in any way apparent that the logs actually reflect the deletion of any computer files and folders belonging to Plaintiff.

"It thus remains unclear whether the 'IP' was a purely intangible interest in intellectual property, an electronic record of that intangible interest, or some other form of electronically stored information. And without further clarity, plaintiff has not adequately alleged that defendant converted 'a specific identifiable thing' that is actionable under New York law." *See BCRS1, LLC v. Unger*, 2021 WL 3667094, at *9 (E.D.N.Y. Aug. 18, 2021) (dismissing conversion claims).

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Plaintiff's Motion in its entirety and grant such other and further relief to Defendant as the Court deems just and proper.

---

(*See* ECF 58 at 9.)

Dated: New York, New York
      December 30, 2024

By:_____/s/ *David H. Kupfer*_____
    David Kupfer, Esq.
    KING & SPALDING LLP
    1185 Avenue of the Americas
    New York, New York 10036
    Tel: (212) 556-2100
    Email: dkupfer@kslaw.com